UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
NEEL ELSHERIF,

Plaintiff,

- against -

AMERICAN AIRLINES, INC. and WILLIAM PITT,

Defendants.
-------------------------------------------------------x

**MEMORANDUM & ORDER**
25-CV-1597 (PKC) (CHK)

PAMELA K. CHEN, United States District Judge:

Plaintiff Neel Elsherif brought this action against Defendants American Airlines, Inc. ("American Airlines" or "AA") and William Pitt ("Pitt") arising out of events aboard an international flight in which Defendant Pitt allegedly masturbated while seated next to Plaintiff Elsherif for approximately one hour, during which time Plaintiff was unable to escape or otherwise receive assistance from the flight attendants. Plaintiff brings claims under the Montreal Convention and for breach of contract against American Airlines, and claims for assault, intentional infliction of emotional distress ("IIED"), or, in the alternative, negligent infliction of emotional distress ("NIED") against Pitt. Before the Court are American Airlines' and Pitt's separate motions to dismiss, as well as Plaintiff's cross-motion for leave to amend and file a Third Amended Complaint. For the reasons explained below, the Court grants in part and denies in part Defendant American Airlines' motion to dismiss, grants Plaintiff's cross-motion for leave to amend, and denies Defendant Pitt's motion to dismiss in its entirety.[1]

[1] As discussed below, the Court construes Defendant American Airlines' motion as a motion to dismiss the Second Amended Complaint ("SAC"), whereas it construes Defendant Pitt's motion as a motion to dismiss both the SAC and, in effect, Proposed Third Amended Complaint ("TAC").

## BACKGROUND

### I. Factual Background[2]

On May 22, 2024, Plaintiff Elsherif purchased a Premium Economy ticket for American Airlines Flight AA198 from New York to Milan, scheduled for May 27, 2024 (the "Flight"), at a price exceeding $3,000. (Proposed Third Am. Compl. ("TAC"), Dkt. 52-1, ¶ 19.) Plaintiff specifically purchased a Premium Economy ticket for the Flight to ensure she could sleep comfortably while traveling for work, as she had a business meeting immediately upon her arrival in Milan. (*Id.* ¶ 20.) The contract of sale for Plaintiff's ticket incorporated American Airlines' conditions of carriage, which state that American Airlines is "dedicated to making every flight memorable, with your safety, comfort and convenience always our top priorities," and that American Airlines has "devoted resources to the front line" and relies on its personnel to resolve customer issues throughout the travel journey. (*Id.* ¶¶ 21–23.)

On May 27, 2024, Plaintiff boarded the Flight and sat in window seat 15C, which was located in the Premium Economy cabin of the airplane. (*Id.* ¶ 25.) A flight attendant assigned to that cabin (the "Flight Attendant") greeted Plaintiff. (*Id.* ¶ 26.) Pitt was assigned the aisle seat

---

[2] The Court's recitation of the Factual Background is based on Plaintiff's SAC, which is the operative pleading, and her TAC, which the Court concurrently grants Plaintiff leave to file and which will become the operative pleading after this Memorandum & Order. The Court cites the TAC herein for simplicity and because the pleadings are largely identical, save for a few edits that are not material to the factual background. (*See generally* Redline, Dkt. 52-2 (showing changes made between SAC and TAC).) For purposes of this Memorandum & Order, the Court assumes that the factual allegations in these pleadings are true and draws all reasonable inferences in Plaintiff's favor. *See Hamilton v. Westchester County*, 3 F.4th 86, 91 (2d Cir. 2021) (explaining that, in resolving a motion to dismiss, the court "accept[s] as true all factual allegations and draw[s] from them all reasonable inferences," while disregarding "conclusory allegations or legal conclusions couched as factual allegations" (quoting *Dane v. UnitedHealthcare Ins. Co.*, 974 F.3d 183, 188 (2d Cir. 2020))).

next to Plaintiff. (*Id.* ¶ 27.)[3] The Flight Attendant knew Plaintiff and Pitt were not traveling together, having observed them arrive separately. (*Id.* ¶ 28.) Before and during the in-flight meal service that began about one hour after departure, the Flight Attendant served Pitt multiple glasses of champagne, after which Pitt became visibly intoxicated. (*Id.* ¶¶ 29–30.)

Following the meal service, the cabin lights dimmed, and Plaintiff prepared to sleep. (*Id.* ¶ 31.) Plaintiff observed Pitt holding his groin and rubbing his genitals over his pants. (*Id.* ¶ 32.) As the conduct intensified, Plaintiff realized that Pitt was masturbating. (*Id.*) Plaintiff alleges, upon information and belief, that Pitt continued masturbating with the intention that Plaintiff notice him. (*Id.* ¶ 36.) Plaintiff immediately was unable to breathe, began to hyperventilate, and became nauseous due to Pitt's conduct, (*id.* ¶ 33), and experienced heart palpitations, (*id.* ¶ 74). Confined to a window seat and in close proximity to Pitt, Plaintiff could not easily escape or alert the Flight Attendant or member of the flight crew. (*Id.* ¶ 34.) Plaintiff does not allege that Pitt blocked her path, other than by occupying the seat that inherently blocks the exit path for the window seat passenger, nor does she allege that Pitt moved toward her, restrained her, threatened her, spoke to her, or attempted to touch her. However, at the time of the incident, Plaintiff believed that Pitt might have attempted to touch her if she had tried to get up or close her eyes and pretend to be asleep. (*Id.* ¶ 35.) Pitt continued masturbating for approximately sixty minutes. (*Id.* ¶ 38.) Plaintiff sat in her seat with her eyes forward, hoping that the Flight Attendant or another flight crew member would walk through the cabin and see what was happening, or so Plaintiff could try

[3] Although not explicitly stated, the Court infers from the SAC that there was no middle seat separating the window seat from the aisle seat, such that Plaintiff was seated directly next to Defendant Pitt. (*See, e.g.*, SAC, Dkt. 35, ¶ 27 (stating that the aisle seat was "next to Plaintiff"); *id.* ¶ 32 (alleging that Defendant Pitt was "next to" Plaintiff).)

to get their attention. (*Id.* ¶ 37.) During that period, no American Airlines crew member walked through the Premium Economy cabin. (*Id.* ¶ 38.)

Plaintiff asserts that American Airlines had notice of prior incidents ("Prior Incidents") of in-flight sexual assaults under these circumstances, i.e., a long-haul flight, dark cabin, female passenger in a window seat next to an intoxicated male passenger being served alcohol, and passengers not traveling together, (*see id.* ¶¶ 4, 39–40 & n.1, 88–89 (citing numerous other similar incidents)), but failed to implement or enforce policies and monitoring to prevent or stop such misconduct, such as by requiring crew members to do at least one cabin walkthrough every sixty minutes, (*id.* ¶¶ 41, 86–90).

When Pitt eventually ceased masturbating, Plaintiff got out of her seat and immediately reported the incident to the Flight Attendant. (*Id.* ¶ 44.) In response, the Flight Attendant stated there was "nothing really that [she] can do" other than move Plaintiff to coach class, and asserted that Pitt's conduct was normal male behavior—remarking "men just do stuff like that" and that the Flight Attendant's husband did "stuff like that." (*Id.* ¶ 45.) The Flight Attendant did not undertake any efforts to investigate Plaintiff's claims, did not report Pitt to American Airlines or law enforcement, and did not advise Plaintiff of her right to contact authorities. (*Id.* ¶¶ 49, 51–52.) The Flight Attendant also refused to ask Pitt to move to a different seat. (*See id.* ¶ 47.) Instead, Plaintiff was moved to a coach class seat. (*Id.* ¶ 48.) Nonetheless, Plaintiff could not sleep for the remainder of the flight, remained nauseous, and continued to have trouble breathing. (*Id.* ¶ 56.) For the rest of the flight, she was afraid that Pitt would retaliate against her for reporting him to the Flight Attendant. (*Id.* ¶ 53.) Plaintiff states that she was so physically and emotionally distressed after the Flight that she was unable to make it to her work meeting upon landing at her destination. (*Id.* ¶¶ 56–58.)

Upon arrival, Plaintiff reported the events and the Flight Attendant's conduct to American Airlines at least four separate times through varied channels, and requested a refund given that she was moved to a coach class seat. (*Id.* ¶¶ 64–67.) American Airlines refused to refund Plaintiff the difference in price between the Premium Economy seat and the coach seat that she moved to after the incident. (*Id.* ¶ 70.)

Plaintiff states that she continues to suffer serious physical and emotional distress as a result of the incident, including depression, post-traumatic stress, anxiety, and fear of flying. (*Id.* ¶¶ 57–62.) Plaintiff further states that she has been unable to take an international overnight flight since May 2024 (with the exception of one flight in June 2026 to see her dying grandmother)[4] and has canceled several work trips and family visits due to the severe physical, mental, and emotional harm that she has suffered as a result of the foregoing. (*Id.* ¶ 61.)

**II. Procedural Background**

Plaintiff filed her original Complaint on March 21, 2025, which named only American Airlines as a defendant. (Compl., Dkt. 1.) On April 17, 2025, American Airlines filed a request for a pre-motion conference ("PMC") in anticipation of a motion to dismiss under Federal Rule of Civil Procedure ("Rule") 12(b)(6) for failure to state a claim. (Def. AA's PMC Req., Dkt. 9.) In response, Plaintiff filed a letter indicating that "[t]o the extent the Court finds that Plaintiff did not sufficiently allege facts to support [her] assertion [about seeking damages for physical pain and suffering due to the sexual assault], Plaintiff can amend her complaint to include such facts." (Pl.'s PMC Opp'n, Dkt. 10, at 2 n.2.) "Based on these PMC letters, the Court [gave] Plaintiff until June 2, 2025, to file an amended complaint," (05/01/2025 Dkt. Order), which she did, (*see* First Am.

---

[4] This fact was added in the TAC. (*Compare* SAC, Dkt. 35, ¶ 61, *with* TAC, Dkt. 52-1, ¶ 61.)

Compl., Dkt. 14). Plaintiff's First Amended Complaint ("FAC") added John Doe, the passenger who allegedly masturbated next to Plaintiff, as a second defendant. (*See id.*) American Airlines then moved to dismiss the FAC under Rule 12(b)(6), and the parties completed briefing for the motion on October 6, 2025. (*See* Def. AA's Mem. Supp. Mot. Dismiss ("AA MTD"), Dkt. 25-1; Pl.'s Mem. Opp'n AA MTD ("Pl.'s Opp'n AA"), Dkt. 27; Def. AA's Reply Supp. AA MTD ("AA Reply"), Dkt. 26.)

On March 20, 2026, Plaintiff sought leave to amend and file a Second Amended Complaint ("SAC") given that Plaintiff had identified William Pitt as the John Doe passenger through discovery. (*See* Pl.'s Letter, Dkt. 34.) Plaintiff indicated that the amendment would only add Pitt in place of John Doe and add claims against Pitt, but would otherwise leave the allegations and claims against American Airlines unchanged. (*See id.* at 2.) American Airlines took no position on the proposed amendment, (*see id.*), and Magistrate Judge Clay H. Kaminsky granted Plaintiff leave to amend, (03/23/2026 Dkt. Order). On March 23, 2026, Plaintiff filed the SAC, (SAC, Dkt. 35), and thereafter served Pitt, (*see* Dkt. 44).[5]

On April 30, 2026, Pitt requested a PMC regarding his anticipated motion to dismiss the SAC. (Def. Pitt's PMC Req., Dkt. 43.) The Court deemed a PMC unnecessary and directed Defendant Pitt to file his motion. (*See* 05/11/2026 Dkt. Order.) On June 11, 2026, Pitt moved to dismiss the SAC under Rule 12(b)(6) for failure to state a claim and under Rule 12(b)(1) for lack of subject-matter jurisdiction. (Def. Pitt's Mem. Supp. Mot. Dismiss ("Pitt MTD"), Dkt. 46-1.)

---

[5] In response to an inquiry from American Airlines, (*see* Dkt. 37), the Court clarified that American Airlines would not need to refile or amend its briefed motion to dismiss in response to Plaintiff's SAC because the allegations against American Airlines remained unchanged from the FAC to the SAC, (*see* 05/11/2026 Dkt. Order). Accordingly, the Court construes all arguments made by American Airlines and Plaintiff in response to the FAC, (*see* AA MTD, Dkt. 25-1; Pl.'s Opp'n AA, Dkt. 27; AA Reply, Dkt. 26), as if made in response to the SAC.

On August 5, 2026, Plaintiff filed her opposition to Pitt's motion, in which she included a cross-motion for leave to amend her pleadings once again to address purported deficiencies Pitt had identified regarding the amount in controversy for Plaintiff's state law claims against him, as well as a proposed Third Amended Complaint. (*See* Pl.'s Mem. Opp'n Def. Pitt's Mot. Dismiss ("Pl.'s Opp'n Pitt"), Dkt. 50; TAC, Dkt. 52-1; *see also* Pitt MTD, Dkt. 46-1, at 14–16 (arguing for dismissal for lack of subject-matter jurisdiction as to the claims against him).) On August 19, 2026, Pitt filed his reply brief, including his opposition to Plaintiff's cross-motion to amend. (Def. Pitt's Reply Supp. Mot. Dismiss ("Pitt Reply"), Dkt. 54.) On August 26, 2026, Plaintiff filed her reply in support of her cross-motion to amend. (Pl.'s Reply Supp. Cross-Mot. Amend., Dkt. 55.)

Now before the Court are American Airlines' motion to dismiss, Pitt's motion to dismiss, and Plaintiff's cross-motion to amend.[6]

**LEGAL STANDARD**

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,'

[6] As previously discussed, *supra* n.1, the Court construes American Airlines' motion to dismiss as being directed, in effect, at the SAC. Because Plaintiff's TAC does not add any allegations as to American Airlines, the Court's granting of leave to Plaintiff to file the TAC does not affect the Court's analysis of American Airlines' motion to dismiss. With respect to Pitt's motion to dismiss, because Pitt expressly directed his motion at the SAC, but did not oppose Plaintiff's motion to file the TAC in his reply, (*see* Pitt Reply, Dkt. 54, at 13), the Court construes his motion to dismiss as being directed at both the SAC and TAC, a proposed version of which Plaintiff filed in the course of briefing the present motions, (*see* TAC, Dkt. 52-1).

but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). "Determining whether a complaint states a plausible claim for relief" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. In reviewing a complaint for failure to state a claim, the Court "accept[s] all factual allegations as true, and draw[s] all reasonable inferences in the plaintiff's favor." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 110–11 (2d Cir. 2010) (citation modified). The Court is not, however, "required to credit conclusory allegations or legal conclusions couched as factual allegations." *Hamilton v. Westchester County*, 3 F.4th 86, 91 (2d Cir. 2021) (quoting *Dane v. UnitedHealthcare Ins. Co.*, 974 F.3d 183, 188 (2d Cir. 2020)).

**DISCUSSION**

Plaintiff brings three claims against American Airlines: (1) strict liability under the Montreal Convention (Article 17), (2) negligence damages beyond the Montreal Convention's strict liability damages cap (Article 21), and (3) breach of contract. (*See* TAC, Dkt. 52-1, ¶¶ 71–111.) American Airlines argues that all three claims should be dismissed for failure to state a claim, or, in the alternative, that certain allegations should be struck from Plaintiff's pleadings. (*See generally* AA MTD, Dkt. 25-1.) As explained below, the Court denies the motion as to the claims pursuant to the Montreal Convention, dismisses Plaintiff's breach of contract claim, and denies the motion to strike.

Plaintiff also brings three claims against Pitt: (1) assault, (2) IIED, or, in the alternative, (3) NIED. (*See* TAC, Dkt. 52-1, ¶¶ 112–35.) Pitt argues that the Court lacks subject-matter jurisdiction over the claims against him, and that all three claims should be dismissed for failure to state a claim. As explained below, the Court denies his motion in its entirety.

# I. Plaintiff's Claims Against American Airlines

## A. Montreal Convention Claims Against American Airlines

### 1. The Montreal and Warsaw Conventions

The parties agree that the Flight constituted international carriage governed by an international treaty commonly known as the Montreal Convention.[7] (*See* TAC, Dkt. 52-1, ¶ 24; AA MTD, Dkt. 25-1, at 6.) The Montreal Convention took effect in 2003, *see Ehrlich v. Am. Airlines, Inc.*, 360 F.3d 366, 371 (2d Cir. 2004), but its precursor, the Warsaw Convention,[8] had been in effect in the United States since 1934, *see Avero Belg. Ins. v. Am. Airlines, Inc.*, 423 F.3d 73, 82 (2d Cir. 2005). The Second Circuit has held that "because many provisions of the two Conventions are substantively similar," *Cohen v. Am. Airlines, Inc.*, 13 F.4th 240, 244 (2d Cir. 2021), "Montreal Convention provisions may be analyzed in accordance with case law arising from substantively similar provisions of its predecessor, the Warsaw Convention," *id.* at 245. Accordingly, in interpreting the Montreal Convention, the Court relies on case law interpreting both Conventions, particularly with respect to Article 17, the text of which the drafters left substantially the same across the two Conventions.[9]

---

[7] Convention for the Unification of Certain Rules for International Carriage by Air (the "Montreal Convention"), May 28, 1999, S. Treaty Doc. No. 106–45, 2242 U.N.T.S. 309 (entered into force in the United States on April 11, 2003).

[8] Convention for the Unification of Certain Rules Relating to International Transportation by Air (the "Warsaw Convention"), Oct. 12, 1929, 49 Stat. 3000, T.S. No. 876 (entered into force in the United States on October 29, 1934).

[9] "Because the only authentic text of the Warsaw Convention is in French, the French text" controls interpretation of the Warsaw Convention. *E. Airlines, Inc. v. Floyd*, 499 U.S. 530, 535 (1991). The French text of Article 17 of the Warsaw Convention reads as follows: "Le transporteur est responsable du dommage survenu en cas de mort, de blessure ou de toute autre lésion corporelle subie par un voyageur lorsque l'accident qui a causé le dommage s'est produit à bord de l'aéronef ou au cours de toutes opérations d'embarquement et de débarquement." 49 Stat. 3005. The American translation of this text, employed by the Senate when it ratified the Convention in 1934, reads: "The carrier shall be liable for damage sustained in the event of the death or wounding of a

2. Strict Liability Under Article 17

Article 17(1) of the Montreal Convention provides as follows: "The carrier is liable for damage sustained in case of death or bodily injury of a passenger upon condition only that the accident which caused the death or injury took place on board the aircraft or in the course of any of the operations of embarking or disembarking." Montreal Convention, art. 17, § 1. A plaintiff asserting a claim for strict liability under Article 17(1) of the Montreal Convention must therefore allege that (1) there has been an "accident" (2) resulting in "bodily injury" and (3) the incident took place while on board the aircraft or during the operations of embarking or disembarking.[10] *See id.* American Airlines argues that Plaintiff's Montreal Convention strict liability claim is deficient for two reasons: it fails to sufficiently allege an "accident" and "bodily injury" as defined by the Convention. (*See* AA MTD, Dkt. 25-1, at 5.) Because American Airlines' "accident" argument is plainly meritless,[11] the Court focuses solely on its argument that Plaintiff has failed to sufficiently allege "bodily injury."

---

passenger or any other bodily injury suffered by a passenger, if the accident which caused the damage so sustained took place on board the aircraft or in the course of any of the operations of embarking or disembarking." 49 Stat. 3018.

The Montreal Convention was enacted with an official English translation, which is quoted herein. Even though the provision exhibits minor changes across the Conventions, the United States entered the Montreal Convention with the understanding that Article 17(1) would "be construed consistently with the precedent developed under the Warsaw Convention." *See* Letter of Submittal of Strobe Talbott, S. Treaty Doc. No. 106-45, 1999 WL 33292734, at *16.

[10] American Airlines does not contest the third element, i.e., that the incident took place while on board the aircraft. (*See generally* AA MTD, Dkt. 25-1.)

[11] "While 'accident' is not defined in the Montreal Convention, the Supreme Court has interpreted the substantively identical provision of the Warsaw Convention as 'an unexpected or unusual event or happening that is external to the passenger.'" *Cohen*, 13 F.4th at 244 (first quoting *Air France v. Saks*, 470 U.S. 392, 405 (1985); and then citing Warsaw Convention, art. 17). Not included in the definition of "accident" are a plaintiff's "own internal reaction[s] to the usual,

American Airlines argues that Plaintiff has not adequately pleaded "bodily injury" under Article 17 of the Montreal Convention because her allegations of physical injury are entirely conclusory and her alleged psychological injuries do not qualify as "bodily injuries." (AA MTD, Dkt. 25-1, at 8–9.) Though Plaintiff's allegations are not conclusory, the Court agrees that Plaintiff's claimed physical injuries of hyperventilation, nausea, heart palpitations, and breathing difficulty, (*see* TAC, Dkt. 52-1, ¶¶ 33, 74), are physical manifestations of her mental state that do not themselves qualify as "bodily injuries" sufficient to give rise to claims under the Convention. The Court disagrees, however, with respect to Plaintiff's claimed injury for post-traumatic stress, (*see id.* ¶¶ 3, 60, 74).

The Supreme Court has held that the Warsaw Convention "does not allow recovery for purely mental injuries," *see E. Airlines, Inc. v. Floyd*, 499 U.S. 530, 534 (1991), but did not address the question of whether physical manifestations of mental injuries can themselves be considered "bodily injuries," *see id.* at 552–53 ("[W]e express no view as to whether passengers can recover for mental injuries that are accompanied by physical injuries. That issue is not presented here because respondents do not allege physical injury or physical *manifestation* of injury." (emphasis added)). While neither the Second Circuit nor the Supreme Court has spoken on whether physical

normal, and expected operation of the aircraft." *Saks*, 470 U.S. at 406. With little elaboration, American Airlines asserts that "the circumstances described [in the FAC, and as unchanged in the TAC] do not constitute an unexpected or unusual event external to the passenger." (AA MTD, Dkt. 25-1, at 5.) Setting aside the conclusory nature of this argument and American Airlines' failure to adequately brief it, the argument is clearly without merit. The Second Circuit has squarely held that a sexual assault carried out by an adjacent passenger under similar circumstances constituted an "accident" under the Warsaw Convention. *See Wallace v. Korean Air*, 214 F.3d 293, 299–300 (2d Cir 2000) (concluding that an "accident" occurred in the context of sexual assault by an adjacent passenger because "it [wa]s plain that the characteristics of air travel increased [plaintiff's] vulnerability to [the adjacent passenger's] assault. When [plaintiff] took her seat in economy class on the . . . flight, she was cramped into a confined space beside two men she did not know, one of whom turned out to be a sexual predator. The lights were turned down and the sexual predator was left unsupervised in the dark. It was then that the attack occurred.").

manifestations of a mental state qualify as "bodily injuries," other courts have held that they do not.[12] The Third, Eighth, and Ninth Circuit Courts of Appeals have squarely held that "physical manifestations of emotional and mental distress do not satisfy the 'bodily injury' requirement." *Carey v. United Airlines*, 255 F.3d 1044, 1051 (9th Cir. 2001); *accord Terrafranca v. Virgin Atl. Airways Ltd.*, 151 F.3d 108, 111 (3d Cir. 1998) (holding that a plaintiff "must demonstrate direct, concrete, bodily injury as opposed to mere manifestation of fear or anxiety"); *In re Air Crash at Little Rock Arkansas, on June 1, 1999*, 291 F.3d 503, 510 (8th Cir. 2002) (holding that "damages for mental injury must proximately flow from physical injuries caused by the accident"); *see also Turturro v. Cont'l Airlines*, 128 F. Supp. 2d 170, 178 (S.D.N.Y. 2001) (holding that since plaintiff's "shortness of breath, sleeplessness, [and] inability to concentrate" "arose solely from her emotional distress," they did not qualify as "bodily injuries" under Article 17 of the Convention). The Court agrees with the reasoning of these cases, which follows logically from the Supreme Court's instruction in *Floyd* that purely mental injuries are not compensable. *See* 499 U.S. at 534. Indeed, to hold otherwise would allow plaintiffs to "skirt *Floyd*'s bar on recovery for 'purely mental injuries' simply by alleging that they suffered some physical manifestations of those injuries, no matter how slight or remote." *Carey*, 255 F.3d at 1052. Thus, if Plaintiff's only allegations of bodily injury were these psychosomatic symptoms, the Court would agree with American Airlines that Plaintiff has not stated a claim.

---

[12] The Second Circuit answered a different question in *Ehrlich*, where it held that airlines "may be held liable under Article 17 [of the Warsaw Convention] for mental injuries only if they are caused by bodily injuries." 360 F.3d at 400. In other words, *Ehrlich* addressed the causal connection required for a plaintiff to sue and recover for mental injuries, and concluded that those mental injuries must have been caused by bodily injuries. Here, in contrast, the question is essentially whether a plaintiff's bodily response to a mental injury can itself qualify as a "bodily injury." *Ehrlich* does not address that question.

However, Plaintiff has also alleged that she suffered "post-traumatic stress" as a result of the incident. (*See* TAC, Dkt. 52-1, ¶¶ 3, 60, 74.) Accepting this allegation as true and drawing all reasonable inferences in Plaintiff's favor, as the Court must do at this stage, the Court finds that Plaintiff has plausibly alleged that she suffered Post-Traumatic Stress Disorder ("PTSD"), which *can* qualify as a "bodily injury" under the Montreal Convention. While the Supreme Court has held with respect to the Warsaw Convention that "an air carrier cannot be held liable under Article 17 when an accident has not caused a passenger to suffer death, *physical* injury, or physical manifestation of injury," *Floyd*, 499 U.S. at 552, the Court notes that a significant body of modern science recognizes that PTSD is a *physical* injury due to its measurable and extraordinary effects on the brain.[13] It is therefore plausible that Plaintiff could put forth evidence, in the form of expert

[13] *See, e.g.*, J. Douglas Bremner, *Traumatic Stress: Effects on the Brain*, 8 Dialogues Clinical Neuroscience 445, 448, 450–51 (2006) (explaining that research into PTSD has revealed that PTSD is "consistent with changes in cognition and brain structure"; that "[b]rain imaging studies have shown alterations in a circuit including medial prefrontal cortex (including anterior cingulate), hippocampus, and amygdala in PTSD" patients; and that MRIs have shown, among other things, "smaller hippocampal volume in PTSD" patients); David J. Nutt & Andrea L. Malizia, *Structural and Functional Brain Changes in Posttraumatic Stress Disorder*, 65 J. Clinical Psych. 11, 16 (2004) ("Neuroimaging technology has enabled great advances in our understanding of the significant structural and functional changes that occur in patients with PTSD. MRI has demonstrated marked reductions in hippocampal volume in a heterogeneous population of adults with PTSD."); Jonathan E. Sherin & Charles B. Nemeroff, *Post-Traumatic Stress Disorder: the Neurobiological Impact of Psychological Trauma*, 13 Dialogues Clinical Neuroscience 263, 270–71, 275 (2011) ("Characteristic changes in brain structure and function have been identified in patients with PTSD using brain-imaging methods. . . . A hallmark feature of PTSD is reduced hippocampal volume. . . . Patients with PTSD exhibit decreased volumes of the frontal cortex, including reduced [anterior cingulate cortex] volumes. . . . Though the presumed mechanism of injury from psychological trauma as opposed to brain trauma is overtly different, the etiologic abnormalities seem to involve similar neurobiological systems and produce overlapping clinical syndromes."); Ahyeon Hwang et al., *Single-Cell Transcriptomic and Chromatin Dynamics of the Human Brain in PTSD*, 643 Nature 744, 744 (2025) (study on molecular biology effects of PTSD finding, among other things, "PTSD-associated gene alterations in inhibitory neurons, endothelial cells[,] and microglia"); *see also* Jennifer Sweeton, Comment, *PTSD as Bodily Injury: Perspectives from Neuroscience and Medical Psychology*, 92 UMKC L. Rev. 703, 710–717 (2024) (collecting scientific research on structural, functional, and physiological brain changes associated with PTSD).

testimony or otherwise, showing that the incident here caused physical injuries to her brain. Therefore, dismissing Plaintiff's "bodily injury" claim entirely at this stage would be premature.[14]

This holding does not conflict with the existing precedent discussed above. While even mild emotional distress might result in temporary physical symptoms like heart palpitations, that physical manifestation is distinguishable from PTSD, which can cause a measurable, physical, and lasting injury to the brain.[15] In other words, the Court's holding is consistent with the requirement that a plaintiff must plausibly allege some bodily injury, not just a manifestation of an emotional state. Furthermore, acknowledging that science has evolved in recent years to recognize PTSD as a physical injury to the brain gives effect to the intention of the Montreal Convention's drafters that "the expression 'bodily injury' [be] included on the basis of the fact that in some States damages for mental injuries are recoverable under certain circumstances, that *jurisprudence in this area is developing* and that it is not intended to interfere with this development." Letter of Submittal of Strobe Talbott, S. Treaty Doc. No. 106-45, 1999 WL 33292734, at *16 (emphasis added) (citation omitted) (note from U.S. State Department representative to United States Senate conveying statement of the Conference on Air Law, which was then recorded in the minutes of the Montreal Convention).

In so holding, the Court reiterates what a number of courts have explicitly and implicitly held. At least three courts in this Circuit have found in favor of airline defendants as to a claim of

---

[14] As the court explained in *Weaver v. Delta Airlines, Inc.*, 56 F. Supp. 2d 1190 (D. Mont. 1999), "the central factor here is not legal, but medical." *Id.* at 1192, *vacated by* 211 F. Supp. 2d 1252 (D. Mont. 2002) (vacated by joint stipulation of the parties). "The legal question . . . is simply whether the [Montreal] Convention allows recovery for this particular kind of bodily injury, i.e., a brain injury (even with slight physical effects). The answer must be yes." *Id.* (discussing Warsaw Convention). The medical question of whether a plaintiff did, in fact, suffer a brain injury due to her PTSD cannot be resolved at this stage of the litigation.

[15] *See supra* n.13 (collecting scientific studies on PTSD's effects on the brain).

PTSD as a "bodily injury" under the Montreal and Warsaw Conventions, but they did so at the summary judgment stage due to a lack of evidence supporting a finding that those specific plaintiffs suffered from PTSD or that PTSD had effected physical changes to their brains. *See Turturro v. Cont'l Airlines*, 128 F. Supp. 2d 170, 179 (S.D.N.Y. 2001) (granting summary judgment to defendant where plaintiff "mention[ed] 'post traumatic stress' in her interrogatory responses and describe[d] herself as 'shell shocked' after her subjective experience of doom onboard the aircraft," but there was "insufficient evidence before [the court] that [plaintiff's] psychiatrist [had] rendered [a PTSD] diagnosis," and instead the court "observe[d] [plaintiff's doctor's] diagnosis of acute stress disorder, which . . . , although it sometimes leads to PTSD, differs from that latter syndrome in significant ways"); *Ligeti v. Brit. Airways PLC*, No. 00-CV-2936 (FM), 2001 WL 1356238, at *5 (S.D.N.Y. Nov. 5, 2001) (recognizing that "[i]n certain instances, an accident victim's PTSD can itself constitute a physical injury because it results in discernible physical changes to the structure of the brain," but granting summary judgment to defendant because plaintiff had "failed to adduce any evidence that her brain underwent such physical changes as a consequence of the incident"); *Kruger v. Virgin Atl. Airways, Ltd.*, 976 F. Supp. 2d 290, 324 (E.D.N.Y. 2013) (collecting cases recognizing the potential for PTSD to qualify as a "bodily injury," but recommending granting summary judgment to defendant where plaintiff had "not put forth any evidence that the [PTSD] ha[d] caused a physical change in her brain"), *report and recommendation adopted*, 976 F. Supp. 2d 290 (E.D.N.Y. 2013) (adopting report and recommendation where "[a]lthough willing to entertain the possibility that" "PTSD can cause physical changes to the brain's structure, meeting the bodily injury standard," "the Magistrate Judge correctly noted the paucity of evidence of physical injury in this case"), *aff'd*, 578 F. App'x 51 (2d Cir. 2014). These decisions both explicitly and implicitly recognized that a plaintiff *could*

satisfy the "bodily injury" requirement where they suffer from PTSD, even if the evidence in those specific cases was ultimately insufficient. *See also Weaver v. Delta Airlines, Inc.*, 56 F. Supp. 2d 1190, 1192 (D. Mont. 1999) (granting summary judgment to plaintiff where plaintiff claimed PTSD and put forth evidence in support, including doctor's report that plaintiff experienced "biochemical reactions which had physical impacts upon her brain and neurologic system"; concluding that the plaintiff's PTSD "evidences an injury to her brain, and the only reasonable conclusion is that it is, in fact, a bodily injury"), *vacated by* 211 F. Supp. 2d 1252 (D. Mont. 2002) (vacated by joint stipulation of the parties); *Carey*, 255 F.3d at 1053 n.47 (noting *Weaver*'s holding and acknowledging that the "possibility" remains "open" for such injuries to constitute "bodily injury," but declining to decide the issue since PTSD was not alleged).

The Court is cognizant of the risk "that the 'floodgates of litigation' might open unless courts carefully scrutinize claims of PTSD to ensure that litigants do not tack such claims onto complaints simply to avoid immediate dismissal." *Turturro*, 128 F. Supp. 2d at 179. But that concern is not implicated here because Plaintiff experienced an "*objectively* very traumatic event[]," *Turturro*, 128 F. Supp. 2d at 179. Again, the Court does not opine on the evidence necessary to prove Plaintiff's claim of "bodily injury" or whether she will ultimately be able to make this showing. The Court holds only that Plaintiff's allegation of post-traumatic stress is sufficient at the motion-to-dismiss stage to plausibly satisfy the "bodily injury" requirement.

American Airlines' motion to dismiss is therefore denied with respect to Plaintiff's claim under Article 17 of the Montreal Convention.

3. <u>Negligence Damages Under Article 21</u>

Plaintiff's second cause of action is for negligence damages under Article 21 of the Montreal Convention. (TAC, Dkt. 52-1, ¶¶ 81–104.) However, as discussed below, there is no

such independent claim under Article 21, which instead limits the damages that can be obtained through an Article 17 claim under certain circumstances.

Article 21 of the Montreal Convention reads as follows:

> 1. For damages arising under paragraph 1 of Article 17 not exceeding 100,000 Special Drawing Rights[16] for each passenger, the carrier shall not be able to exclude or limit its liability.
>
> 2. The carrier shall not be liable for damages arising under paragraph 1 of Article 17 to the extent that they exceed for each passenger 100,000 Special Drawing Rights if the carrier proves that:
>
>> (a) such damage was not due to the negligence or other wrongful act or omission of the carrier or its servants or agents; or
>>
>> (b) such damage was solely due to the negligence or other wrongful act or omission of a third party.

Montreal Convention, art. 21. The plain text of Article 21 makes clear that there is no cap on damages under the Montreal Convention unless the *defendant airline* proves a lack of negligence and that the damages cap specified in Article 21 therefore applies. Courts consistently treat the Article 21 damages cap as an *affirmative defense*, not as an independent cause of action. *See, e.g.*, *Garcia Concepcion v. Helidosa Aviation Grp., S.A.*, No. 6:23-CV-2399 (GAP) (UAM), 2025 WL 3646126, at *3 (M.D. Fla. May 20, 2025) (explaining that the claimed damages cap under Article 21 "does not point out a defect in the plaintiff's prima facie case; rather it asserts that any financial

[16] "An SDR, or Special Drawing Right, is a unit of account created by the International Monetary Fund and calculated daily on the basis of a basket of currencies." *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 20 n.1 (2004). The maximum amount of Special Drawing Rights under Article 21 had increased to 128,821 at the time of Plaintiff's Flight. *See 2024 Revised Limits of Liability Under the Montreal Convention of 1999*, ICAO, https://www.icao.int/sites/default/files/secretariat/legal/LEB%20Treaty%20Collection%20Documents/2024_Revised_Limits_of_Liability_Under_the_Montreal_Convention_of_1999_en.pdf [https://perma.cc/AG3X-AVHC] (last visited Sep. 21, 2026); Montreal Convention, art. 24(1) (requiring review by the International Civil Aviation Organization of Special Drawing Rights limits every five years).

liability awarded to plaintiff will be limited by law," and concluding that it was properly pled as an affirmative defense (citation modified)); *Quevedo v. Iberia Lineas Aereas de España, Sociedad Anónima Operadora Co.*, No. 17-CV-21168 (RNS), 2018 WL 4776754, at *6 (S.D. Fla. Oct. 3, 2018) (denying summary judgment on defendant airline's Article 21 affirmative defense since material factual disputes precluded the court "from finding, as a matter of law, that negligence or wrongful conduct of [the airline] either was, or was not, a cause of the [p]laintiffs' injuries"); *Smith v. Am. Airlines, Inc.*, No. 09-CV-2903 (WHA), 2009 WL 3072449, at *4 (N.D. Cal. Sep. 22, 2009) (explaining that, as an "affirmative defense," "Article 21(2) provides a method to limit the defendant's liability to no more than 100,000 SDR if the defendant can prove that they were not negligent," but it does not permit the plaintiff to assert independent state law negligence claims in the complaint); *Singh v. Caribbean Airlines Ltd.*, No. 13-CV-20639 (CMA), 2014 WL 11899477, at *2 (S.D. Fla. Jan. 31, 2014) (denying motion to strike the defendant's Article 21 affirmative defense that sought "to limit liability pursuant to the terms of the Montreal Convention" (citation omitted)); *In re Air Crash Near Rio Grande Puerto Rico on Dec. 3, 2008*, No. 11-MD-2246 (KAM), 2016 WL 6916599, at *1 (S.D. Fla. Jan. 21, 2016) (concluding "that any attempt to shift liability resulting from an aircraft accident from the carrier is an affirmative defense under Article 21 of the Montreal Convention" and thus was waived when not pled in defendant's answer).

It thus appears that Plaintiff's negligence claim should be dismissed as an improperly pled cause of action that is in reality an affirmative defense to be raised, if at all, by American Airlines. However, American Airlines never raised this argument in its motion to dismiss. Instead, American Airlines' arguments were focused exclusively on whether Plaintiff's allegations constitute negligence. (AA MTD, Dkt. 25-1, at 10–14.) The Court denies American Airlines' motion to dismiss as to this cause of action, but acknowledges that American Airlines might be

entitled to dismissal if the argument is properly raised. The Court therefore directs the parties to meet and confer regarding whether they can reach an agreement about how to proceed with this claim. If the parties cannot agree, and if American Airlines chooses to make the argument that Article 21 does not give rise to a claim that can be brought by Plaintiff, it may file a letter in accordance with Rule 3(A) of the Court's Individual Practices and Rules regarding an anticipated motion for judgment on the pleadings. Meanwhile, at this time, the Court does not address American Airlines' argument that its alleged actions were not negligent. That dispute is properly addressed on the merits via a motion for judgment on the pleadings, or at summary judgment, only after American Airlines has raised it as an affirmative defense in its answer.

### B. Breach of Contract Claim Against American Airlines

Plaintiff also brings a breach of contract claim against American Airlines for, in effect, downgrading her from the Premium Economy seat she had paid for to a coach seat without refunding her the difference. (TAC, Dkt. 52-1, ¶¶ 105–11.) Regardless of whether Plaintiff has sufficiently stated a breach of contract claim under state law, this claim must be dismissed as preempted by the Montreal Convention.

Article 29 of the Montreal Convention describes the Convention's preemptive effect: "In the carriage of passengers, . . . any action for damages, however founded, whether under this Convention or in contract or in tort or otherwise, can only be brought subject to the conditions and such limits of liability as are set out in this Convention . . . ." Montreal Convention, art. 29. Accordingly, "[a]ll state law claims that fall within the scope of the Convention are preempted." *Fishman v. Delta Air Lines, Inc.*, 132 F.3d 138, 141 (2d Cir. 1998) (citation omitted); *accord El Al Isr. Airlines, Ltd. v. Tsui Yuan Tseng* ("*Tseng*"), 525 U.S. 155, 174–75 (1999) ("[T]he Convention's preemptive effect is clear: The treaty precludes passengers from bringing actions

under local law when they cannot establish air carrier liability under the treaty.")[17] The only question then is whether a contract claim for a mid-flight seat downgrade is "within the scope of the Convention." The Court finds that it is.

The plain text of Article 29 strongly suggests that Plaintiff's breach of contract claim is within the scope of the Convention. This claim arises out of the "carriage of passengers," is an "action for damages," and is a claim "in contract." *See* Montreal Convention, art. 29. Accordingly, at least two courts have directly held that the type of breach of contract claim Plaintiff brings is preempted. *See Sobol v. Cont'l Airlines*, No. 05-CV-8992 (LBS), 2006 WL 2742051, at *5 (S.D.N.Y. Sep. 26, 2006) (citing *Tseng* and concluding that breach of contract, conversion, and unjust enrichment claims against airline arising out of a seat downgrade were preempted since the Montreal Convention does not contain a provision allowing such claims); *David v. United Airlines, Inc.*, No. 15-CV-2262 (ODW) (PJW), 2016 WL 1573423, at *5 (C.D. Cal. Apr. 18, 2016) (concluding that breach of contract claim against airline for seat downgrade was preempted by Montreal Convention because the claim fell "outside the bounds of the Convention's delineated categories of liability").

Plaintiff cites a decision by another court purportedly holding the opposite, but the Court finds that decision distinguishable. (Pl.'s Opp'n AA, Dkt. 27, at 21 (citing *Roske v. Deutsche Lufthansa AG*, No. 11-CV-4534 (LTS), 2013 WL 12617191, at *3 (S.D.N.Y. Feb. 14, 2013)).) In

[17] Even though the *Fishman* and *Tseng* decisions preceded the Montreal Convention and were interpreting the Warsaw Convention, because the preemptive language of the two conventions is substantially similar, they have "substantially the same preemptive effect." *Paradis v. Ghana Airways Ltd.*, 348 F. Supp. 2d 106, 111 (S.D.N.Y. 2004); *see id.* ("Article 29 of the Montreal Convention simply clarified the language of [an amendment to] Article 24(1) of the Warsaw Convention."); *see also Cohen*, 13 F.4th at 244 ("[B]ecause many provisions of the two Conventions are substantively similar . . . Montreal Convention provisions may be analyzed in accordance with case law arising from substantively similar provisions of its predecessor.").

*Roske*, the court held that a claim for breach of contract arising out of a seat downgrade was not preempted, 2013 WL 12617191, at *3, but the seat downgrade occurred when the plaintiff attempted to check in for the flight, *id.* at *1, whereas here the seat downgrade occurred *during* the Flight.[18] The preemptive scope of the Convention is based largely on *when* a claim arises. In *King v. American Airlines, Inc.*, 284 F.3d 352 (2d Cir. 2002), the Second Circuit recognized that, for purposes of preemption, "Article 17's substantive scope extends to all passenger injuries occurring on board the aircraft or in the course of any of the operations of embarking and disembarking—even if the claim is not actionable under the treaty." *Id.* at 359 (internal quotation marks omitted) (quoting *Tseng*, 525 U.S. at 172). Therefore, the Second Circuit held that the plaintiffs' claims in *King*, that they were bumped from their flight because of racial discrimination, were preempted by Article 17 since the plaintiffs were bumped during the embarkation process, and the fact that racial discrimination claims are entirely unrelated to Article 17's focus on death and injury claims was irrelevant. *Id.* at 358–59.

Aside from citing to *Roske*, the crux of Plaintiff's argument is that her claim is one for non-performance of a contract, a type of claim that a number of courts have recognized as outside the scope of the Montreal Convention and thus not preempted. Importantly though, in most of those cases, the plaintiffs were denied the chance to take the flight they had purchased a ticket for. *See, e.g.*, *Mullaney v. Delta Air Lines, Inc.*, No. 08-CV-7324 (CM) (THK), 2009 WL 1584899, at *2

[18] The *Roske* court did not explicitly base its conclusion on the timing of the seat downgrade, and instead reasoned only that "[t]he alleged ticket downgrade d[id] not fall within any of" "the three situations in which a carrier is liable thereunder: (1) death or bodily injury of passengers; (2) damage to baggage; and (3) delay of passengers, baggage and cargo" "and therefore, [wa]s not preempted by the Montreal Convention." 2013 WL 12617191, at *3 (alteration adopted) (citation omitted). To the extent that the *Roske* court's holding of non-preemption could be interpreted as applying to a mid-flight seat downgrade, the Court finds it unpersuasive for the reasons stated herein.

(S.D.N.Y. June 3, 2009) (citing *In re Nigeria Charter Flights Cont. Litig.*, 520 F. Supp. 2d 447, 453 (E.D.N.Y. 2007)).[19] But Plaintiff supplies no authorities, aside from *Roske*, to support the argument that a seat downgrade in the midst of a flight constitutes complete non-performance of an airline's contractual obligations. The Court is similarly aware of no such authorities, which is unsurprising because a seat downgrade is more logically characterized as partial performance, not complete non-performance.

The Court concludes that Plaintiff's breach of contract claim for a mid-flight seat downgrade is preempted by Article 29 of the Montreal Convention.[20]

**C. American Airlines' Request to Strike Certain Allegations**

American Airlines included in its motion to dismiss an alternative request that, if the Court did not dismiss Plaintiff's claims against it in their entirety, the allegations referring to similar incidents on other flights be stricken from Plaintiff's operative pleading. (*See* AA MTD, Dkt. 25-1, at 17–18.)

Rule 12(f) permits a court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "To prevail on a motion to strike, the movant must show [that] (1) no evidence in support of the allegations would

---

[19] In *Mullaney*, the court differentiated between what are essentially claims of "delay," which are governed by Article 19 of the Convention, and claims of complete "non-performance"—i.e., the passenger was never given a chance to fly at all. 2009 WL 1584899 at *2. However, *Mullaney* and other similar cases involve cancelled flights, and the delay/non-performance distinction turns on whether the airlines offered replacement flight options. Those holdings have no relevance to Plaintiff's claims regarding a mid-flight seat downgrade.

[20] Plaintiff does not argue that her contract claim could be brought pursuant to the Montreal Convention, and for good reason as it would not survive dismissal. *See, e.g.*, *Adegoke v. Delta Airlines, Inc.*, No. 22-CV-1109 (PB), 2022 WL 17363892, at *4 (S.D. Tex. Dec. 1, 2022) (holding that a claim for downgraded ticket class is not permitted under the Montreal Convention and stating that the court was "unaware of any authority to support the proposition that the Montreal Convention would allow for recovery under that theory").

be admissible; (2) the allegations have no bearing on the relevant issues; and (3) permitting the allegations to stand would result in prejudice to the movant." *Westwide Winery, Inc. v. SMT Acquisitions, LLC*, 511 F. Supp. 3d 256, 264 (E.D.N.Y. 2021) (citation omitted). A court "should not tamper with the pleadings unless there is a strong reason for so doing," *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976) (citations omitted), and so the "party moving to strike bears a heavy burden," *Kumaran v. Northland Energy Trading, LLC*, 762 F. Supp. 3d 322, 330 (S.D.N.Y. 2025) (citation omitted). "[I]t is well-settled that Rule 12(f) motions are not favored and will not be granted unless it is clear that the allegations in question have no possible bearing on the subject matter of the litigation." *Collier v. Boymelgreen Devs.*, No. 06-CV-5425 (SJ), 2008 WL 835706, at *10 (E.D.N.Y. Mar. 28, 2008) (citation and internal quotation marks omitted).

Here, American Airlines has entirely failed to bear the "heavy burden" necessary to justify the extraordinary remedy of striking pleadings. American Airlines argues that the allegations related to similar incidents on other flights are irrelevant to Plaintiff's claims since they "do not relate to the Flight Attendant on the Subject Flight, or even the subject route," and "are unduly prejudicial, would confuse the issues, are immaterial, impertinent, disparaging, and misleading, and Plaintiff has included this random information to mislead the Court and prejudice [American Airlines]." (AA MTD, Dkt. 25-1, at 18.) American Airlines otherwise provides no support—through case law or otherwise—for its argument that these allegations should be stricken. (*See generally id.*) These conclusory statements of irrelevance and prejudice cannot possibly justify striking the allegations. American Airlines' complete failure to attempt to justify its request to strike these allegations merits denying the request.

Even assuming *arguendo* that American Airlines had attempted to meet its burden for striking these allegations, the argument would still be without merit as the allegations have at least plausible relevance to Plaintiff's claims. The allegations at issue concern American Airlines' "well[-]documented history of failing to protect its female passengers from sexual harassment and assault, particularly on long-haul flights where the cabin is dark, the female victim is in the window seat, seated next to a male stranger who was being served copious amounts of alcohol by the flight attendant." (TAC, Dkt. 52-1, ¶ 4.) These allegations speak to whether American Airlines was on notice of the danger to its passengers under these circumstances, which is relevant to both duty and causation for the purposes of the Article 21 negligence dispute. And, in arguing (albeit misguidedly) that Plaintiff has failed to state a negligence claim, American Airlines has explicitly put this aspect of Plaintiff's claims at issue. (*See* AA MTD, Dkt. 25-1, at 13 (arguing that there was a lack of duty in this context because "[t]here is no indication that Defendant knew or should have known of the alleged conduct prior to Plaintiff's report").) Even though, as discussed, Article 21 does not create a cause of action for negligence, whether American Airlines was negligent is plainly relevant to whether Article 21's damages cap applies to Plaintiff's Article 17(1) claim. The allegations about other similar incidents are also relevant to Plaintiff's showing that an "accident" occurred because this element turns on the airline's involvement in that event. *See Wallace v. Korean Air*, 214 F.3d 293, 299–300 (2d Cir 2000) (concluding that an "accident" occurred because "it [wa]s plain that the characteristics of air travel increased [plaintiff's] vulnerability to [the adjacent passenger's] assault. When [plaintiff] took her seat in economy class on the . . . flight, she was cramped into a confined space beside two men she did not know, one of whom turned out to be a sexual predator. The lights were turned down and the sexual predator was left unsupervised in the dark. It was then that the attack occurred."); *see also Fulop v. Malev Hungarian Airlines*,

175 F. Supp. 2d 651, 657 (S.D.N.Y. 2001) (noting in the context of the Warsaw Convention that "[t]he larger the role of the airline in the causal chain, and the greater the knowledge and involvement of its personnel and operations in bringing about the harmful event, the more likely it is that liability will be found"); *Langadinos v. Am. Airlines, Inc.*, 199 F.3d 68, 71 (1st Cir. 2000) (discussing in the context of Warsaw Convention claims that the airline's awareness of certain conditions and the foreseeability of a risk of injury stemming from serving a passenger alcohol was relevant to whether an "accident" occurred).

Accordingly, American Airlines' request to strike is denied.

## II. Plaintiff's Claims Against Pitt

### A. Subject-Matter Jurisdiction Over Plaintiff's Claims Against Pitt

Pitt argues that Plaintiff's claims against him should be dismissed under Rule 12(b)(1) for lack of subject-matter jurisdiction because she has not adequately pled an amount in controversy that exceeds $75,000 to establish diversity jurisdiction. (Pitt MTD, Dkt. 46-1, at 14–16.) In response, Plaintiff argues that the Court does have jurisdiction for three reasons: (1) it has supplemental jurisdiction over the claims against Pitt based on the Court's federal-question jurisdiction over the claims against American Airlines; (2) Plaintiff's pleadings are not deficient as to the amount in controversy; and (3) if the pleadings in the SAC are insufficient, Plaintiff has cross-moved for leave to amend and file the TAC, which she claims satisfies the amount-in-controversy requirement. (Pl.'s Opp'n Pitt, Dkt. 50, at 19–25.) Pitt does not oppose the motion for leave to amend with the TAC, (*see* Pitt Reply, Dkt. 54, at 13), so the only question is whether the TAC sufficiently alleges jurisdiction over Plaintiff's claims against Pitt.

A claim is "properly dismissed for lack of subject[-]matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) (citing Fed. R. Civ. P. 12(b)(1)). Federal courts

have the statutory power to adjudicate cases through either diversity jurisdiction or federal question jurisdiction. *Smulley v. Safeco Ins. Co. of Ill.*, No. 21-2124-CV, 2022 WL 16753118, at *1 (2d Cir. Nov. 8, 2022) (summary order) (citing 28 U.S.C. §§ 1331, 1332). With respect to diversity jurisdiction pursuant to 28 U.S.C. § 1332 ("Section 1332"), "federal courts have jurisdiction to hear civil actions between citizens of different States as long as the matter in controversy exceeds $75,000." *Platinum-Montaur Life Scis., LLC v. Navidea Biopharms., Inc.*, 943 F.3d 613, 617 (2d Cir. 2019) (internal quotation marks and ellipses omitted) (citing 28 U.S.C. § 1332). Diversity jurisdiction requires complete diversity, i.e., "there is no plaintiff and no defendant who are citizens of the same State." *Id.* (quoting *Wis. Dep't of Corr. v. Schacht*, 524 U.S. 381, 388 (1998)). Diversity jurisdiction also requires a "'reasonable probability' that the amount in controversy exceeds $75,000." *Smulley*, 2022 WL 16753118, at *1 (first quoting *Moore v. Betit*, 511 F.2d 1004, 1006 (2d Cir. 1975); and then citing 28 U.S.C. § 1332). Generally, "the party asserting subject matter jurisdiction 'has the burden of proving by a preponderance of the evidence that it exists.'" *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014) (quoting *Makarova*, 201 F.3d at 113).

While the party asserting subject-matter jurisdiction—here, Plaintiff—has the burden of proving that "it appears to a 'reasonable probability' that the claim is in excess of the statutory jurisdictional amount," *Tongkook Am., Inc. v. Shipton Sportswear Co.*, 14 F.3d 781, 784 (2d Cir. 1994) (citation omitted), "[i]t is well-settled that 'the sum claimed by the plaintiff controls if the claim is apparently made in good faith,'" *Carling v. Peters*, No. 10-CV-4573 (PAE) (HBP), 2013 WL 865842, at *4 (S.D.N.Y. Mar. 8, 2013) (emphasis omitted) (quoting *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288–89 (1938)). Accordingly,"[a] complaint alleging complete diversity will only be dismissed if it appears to a *legal certainty* that the amount in controversy

*does not* exceed $75,000" *Legacy Agency, Inc. v. Scoffield*, 559 F. Supp. 3d 195, 203 (S.D.N.Y. 2021) (emphasis added) (citing *Tongkook*, 14 F.3d at 784). To justify dismissal under this standard, the defendant must show to "a legal certainty that the plaintiff could not recover the amount alleged or that the damages alleged were feigned to satisfy jurisdictional minimums." *Schwartz v. Hitrons Sols., Inc.*, 397 F. Supp. 3d 357, 365 (S.D.N.Y. 2019) (quoting *Colavito v. N.Y. Organ Donor Network, Inc.*, 438 F.3d 214, 221 (2d Cir. 2006)). "To overcome the presumption [that the sum asserted by the plaintiff is the amount in controversy], 'the legal impossibility of recovery must be so certain as virtually to negate the plaintiff's good faith in asserting the claim.'" *Id.* (quoting *Scherer v. Equitable Life Assurance Soc'y of U.S.*, 347 F.3d 394, 397 (2d Cir. 2003)).

Here, Plaintiff has alleged damages that exceed the $75,000 amount-in-controversy requirement. (*See* TAC, Dkt. 52-1, ¶ 119 (alleging no less than $100,000 in damages for assault claim); *id.* ¶ 126 (alleging no less than $125,000 in damages for IIED claim); *id.* ¶ 135 (alleging no less than $100,000 in damages for NIED claim).) In response, Pitt makes no argument that Plaintiff cannot, as a "legal certainty," claim these amounts in damages in good faith. Instead, Pitt takes issue with what he characterizes as conclusory damages amounts without sufficient supporting facts. (*See* Pitt Reply, Dkt. 54, at 13–14.) But "to dismiss [Plaintiff's] claims, [Pitt] must show that [Plaintiff] *cannot* recover the claimed amount, not that [s]he *does not* allege sufficient fact[s] to establish Article III jurisdiction." *See Summerville*, 765 F. Supp. 3d at 303.[21]

[21] Defendant Pitt cites only two cases to support his argument that Plaintiff's allegations as to the jurisdictional amount are insufficient, but both involved *defendants* opposing remand to state court following removal and claiming the amount-in-controversy threshold was satisfied while the plaintiffs expressly *disclaimed* that more than $75,000 was at stake. (*See* Pitt Reply, Dkt. 54, at 13–14 (first citing *Ma v. United Rentals (N. Am.), Inc.*, 678 F. Supp. 3d 412, 416 (S.D.N.Y. 2023); and then citing *Jean-Louis v. Amazon.com Servs., LLC*, No. 22-CV-5020 (PKC) (RER), 2022 WL 3867668, at *3 (E.D.N.Y. Aug. 29, 2022)).) In any event, the cases Pitt cites involved emotional

Pitt has thus failed to raise any colorable argument to rebut the damages amounts Plaintiff claims. The damages Plaintiff alleges in her TAC are sufficient to satisfy the amount-in-controversy requirement and the Court therefore has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332 to consider Plaintiff's claims against Pitt.[22]

**B. Assault Claim Against Pitt**

Next, Pitt argues that Plaintiff fails to state a claim pursuant to Rule 12(b)(6) for assault. "Under New York law, civil assault 'is an intentional placing of another person in fear of imminent harmful or offensive contact.'" *Tardif v. City of New York*, 991 F.3d 394, 410 (2d Cir. 2021) (quoting *Charkhy v. Altman*, 678 N.Y.S.2d 40, 41 (1st Dep't 1998)).[23] "A plaintiff states an assault

---

distress claims where the complaint included no monetary figure and so the courts declined to estimate the damages sought to establish the amount in controversy. *See Ma*, 678 F. Supp. 3d at 415–16; *Jean-Louis*, 2022 WL 3867668, at *2–3 (declining to estimate emotional distress claim amount, finding the claims for back pay were for only $8,553.60, and disregarding front pay claim since it was insufficiently pled).

[22] Since the Court finds that diversity jurisdiction exists, it does not address whether it could properly exercise supplemental jurisdiction in the alternative.

[23] Neither party briefed the issue of what law applies to Plaintiff's tort claims, but both Plaintiff and Pitt seem to assume that New York law applies. (*See generally* Pitt MTD, Dkt. 46-1 (exclusively referencing New York tort law); Pl.'s Opp'n Pitt, Dkt. 50 (same).) "In a diversity case, federal courts apply the choice[-]of[-]law rules prevailing in the states where they sit." *Kalaj v. Kay*, No. 21-CV-4395(EK) (JRC), 2023 WL 4564795, at *6 (E.D.N.Y. July 17, 2023) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). For tort claims, New York's choice-of-law rules direct courts to "seek to apply the law of the jurisdiction with the most significant interest in, or relationship to, the dispute." *Holborn Corp. v. Sawgrass Mut. Ins. Co.*, 304 F. Supp. 3d 392, 398 (S.D.N.Y. 2018) (quoting *White Plains Coat & Apron Co. v. Cintas Corp.*, 460 F.3d 281, 284 (2d Cir. 2006)). Here, New York is likely the jurisdiction with the most significant interest in and relationship to the dispute, since it is both the Flight's point of origin and where Plaintiff is domiciled. The only other conceivable jurisdictions that might have an interest in the dispute are Pennsylvania—where Pitt resides, but which is otherwise unrelated to the claims—or Italy—the Flight's destination, though the conduct seemingly occurred before the Flight was in Italian airspace. Since New York law appears to be the most plausible choice, and Plaintiff and Pitt both assume it applies, the Court evaluates Plaintiff's claims under New York law. *See Trikona Advisers Ltd. v. Chugh*, 846 F.3d 22, 31–32 (2d Cir. 2017) (explaining that where the parties' briefs assumed that a certain state's law applied, "such implied consent is . . . sufficient

claim by alleging that 'the defendant intended either to inflict personal injury or to arouse apprehension of harmful or offensive bodily contact.'" *Mayorga v. Greenberg*, No. 22-CV-0387 (AMD) (RML), 2023 WL 6307994, at *9 (E.D.N.Y. Sep. 28, 2023) (quoting *Bouveng v. NYG Cap. LLC*, No. 14-CV-5474 (PGG), 2015 WL 3503947, at *9 (S.D.N.Y. June 2, 2015)).

Pitt argues that Plaintiff's assault claim fails because there was no "imminent" threat of contact and that the circumstances did not create "reasonable apprehension" of bodily harm. (Pitt MTD, Dkt. 46-1, at 6–8.) But Pitt is wrong. Accepting Plaintiff's allegations as true, which the Court must at this stage, Pitt's actions constitute the epitome of assault.

1. Imminence

Pitt argues that Plaintiff does not and cannot plead an *imminent* threat of harmful or offensive contact because Plaintiff "does not allege that Pitt touched her, tried to touch her, reached toward her, moved toward her, threatened her, spoke to her, blocked her path, or otherwise communicated an intent to make immediate bodily contact." (Pitt MTD, Dkt. 46-1, at 6.) Pitt acknowledges that Plaintiff alleges that she believed Pitt "[might have] attempt[ed] to touch her if she tried to get up or closed her eyes or pretended to be asleep," (*id.* (quoting SAC, Dkt. 35, ¶ 35)), but he argues that this was only "conditional apprehension of possible future contact," not "apprehension of harmful or offensive contact that was about to occur," (*id.*).

In support of his argument, Pitt suggests that Plaintiff's claim is similar to the assault claim that was dismissed in *Ma v. Zhou*, No. 23-CV-4616 (NCM) (LB), 2024 WL 4571209 (E.D.N.Y. Oct. 23, 2024). (*See* Pitt MTD, Dkt. 46-1, at 6–7 (discussing *Ma*, 2024 WL 4571209, at *3).) In *Ma*, the defendant had allegedly made death threats regarding the plaintiff when speaking with

to establish the applicable choice of law" (ellipses in original) (quoting *Arch Ins. Co. v. Precision Stone, Inc.*, 584 F.3d 33, 39 (2d Cir. 2009))).

third parties and simultaneously making a "throat-slitting gesture with her hand." 2024 WL 4571209 at *1. The court held that, even if the defendant had made the throat-slitting gesture directly to the plaintiff (which the plaintiff had not alleged), "[a]t most, this remark and accompanying hand gesture would convey a potential for future, non-imminent harm." *Id.* at *3. However, the hand gesture in *Ma*, made only to third parties and, in any event, unaccompanied by any apparent ability of the defendant to harm the plaintiff in the moment, rendered the alleged threat far more remote in time and certainty than Pitt's conduct toward Plaintiff, at a time when she was effectively trapped in her seat by Pitt within inches of him and he had the imminent means and opportunity to touch her in an offensive manner, all while physically evincing a threat to do so (by masturbating). *See Imminent*, Oxford English Dictionary Online, https://www.oed.com/dictionary/imminent_adj (last visited Sep. 17, 2026) ("Imminent" defined as: "Of an event . . . (almost always of evil or danger): Impending threateningly, hanging over one's head; ready to befall or overtake one; close at hand in its incidence; coming on shortly"); *Imminent*, *Black's Law Dictionary* 898 (11th ed. 2019) ("Imminent" defined as: "(Of a danger or calamity) threatening to occur immediately; dangerously impeding"; or "[a]bout to take place"). The Court finds the comparison to *Ma* inapt.

Pitt's other unavailing attempt to characterize his actions as anything other than presenting imminent harm is to point to the fact that his alleged conduct lasted sixty minutes, during which time he never ultimately attempted to touch her. (*See* Pitt MTD, Dkt. 46-1, at 7.) But this argument, unsupported by any authorities, fails on its face. If one were to point a loaded gun at someone seated in a chair, the fact that sixty minutes passed without actually shooting the seated person would not mean that there was not an imminent threat for the entire period. To suggest that at the forty-five-minute mark, the seated person could have reasonably stopped fearing they would

be shot belies the reality of the threat and its imminence. So too here: Plaintiff could have reasonably believed throughout the entire period that the threat of physical touch was imminent at any second even though with each passing minute Pitt had not yet initiated contact. If anything, the duration of the encounter and the perceived threat of harm only added to Plaintiff's injury.

2. Threat Sufficient to Create Reasonable Apprehension

Pitt independently argues for dismissal of the assault claim because, according to him, Plaintiff does not and cannot plead that there was "physical menace" sufficient to create reasonable apprehension of harm. (*See id.* at 7–8.) This argument is similar to, and equally unconvincing as, Pitt's argument about imminence. As Pitt acknowledges, "plaintiff need not prove actual contact," although "she must allege some physical menace against [her] body." *Bouveng*, 2015 WL 3503947, at *9 (alteration in original) (quoting *Wahlstrom v. Metro–N. Commuter R.R. Co.*, 89 F. Supp. 2d 506, 528 (S.D.N.Y. 2000)); (*see* Pitt MTD, Dkt. 46-1, at 7 (discussing *Bouveng*, 2015 WL 3503947, at *9)). But here Plaintiff has done that: she alleges that Pitt was masturbating and directing his actions at her, which surely establishes a plausible inference of a threat of harmful physical contact. To the extent that Pitt's argument is that he never "leaned into Plaintiff" or "grabbed for her," (Pitt MTD, Dkt. 46-1, at 7), such conduct is not necessary as a matter of law to establish that he was physically menacing Plaintiff, and that argument speaks to a factual dispute as to the degree to which his conduct was directed toward her.

Pitt's abbreviated argument to the contrary is entirely premised on two wholly inapposite cases, and borders on frivolous. First, he cites *Bouveng*, in which the court dismissed the assault claim because the allegations amounted to merely screaming at the plaintiff, who was the defendant's employee, and threats to fire the plaintiff. 2015 WL 3503947 at *9. The court held that "[h]arsh words or verbal threats, standing alone, do not constitute assault," and that accordingly there was no reason for the plaintiff to believe she was in danger of imminent bodily

harm. *Id.* (alteration in original) (quoting *Kravtsov v. Town of Greenburgh*, No. 10-CV-3142 (CS), 2012 WL 2719663, at *16 (S.D.N.Y. July 9, 2012)). Pitt misguidedly argues that Plaintiff "alleges less than *Bouveng* because [she] alleges no words directed at Plaintiff at all." (Pitt MTD, Dkt. 461, at 8.) But, as the adage goes, actions often speak louder than words. Indeed, one could not argue that silently holding a gun to someone's head does not convey a threat of harm. As the Court has already explained, Plaintiff reasonably could have felt threatened by Pitt's alleged wordless physical conduct.

Second, Pitt cites *Cecora v. De La Hoya*, 965 N.Y.S.2d 464 (1st Dep't 2013), in which the plaintiff alleged that she voluntarily engaged in sexual conduct with the defendant and then subsequently rebuffed four attempts by the defendant to resume sexual contact overnight. *See Cecora v. Hoya* ("*Cecora I*"), Index No. 112787/11, slip op. at 2, 2012 WL 1240996 (N.Y. Sup. Ct. N.Y. Cnty. Mar. 30, 2012) (citation modified), *aff'd sub nom. Cecora v. De La Hoya* ("*Cecora II*"), 965 N.Y.S.2d 464 (1st Dep't 2013); (Pitt MTD, Dkt. 46-1, at 8 (citing *Cecora II*, 965 N.Y.S.2d at 465)). There, the New York Supreme Court Appellate Division affirmed the trial court's dismissal of the action and concluded that the "plaintiff's assertion that she was placed in imminent apprehension of harmful contact by defendant's sexual advances was contradicted by the allegations of the complaint." *Cecora II*, 965 N.Y.S.2d at 465 (citation omitted). For example, the plaintiff had stayed in the defendant's hotel room the morning after the alleged assault and "voluntarily waited for the [d]efendant to return." *Cecora I*, slip op. at 5. Pitt makes zero attempt to explain how that holding is relevant here—where Plaintiff's allegations are not internally contradictory—and instead discusses the comparisons between this case and the reasons the court in *Cecora* dismissed a false imprisonment claim, which has not been made here. (*See* Pitt MTD, Dkt. 46-1, at 8.) Nothing about *Cecora* is relevant to this case.

Plaintiff has adequately pled an assault claim against Pitt.

**C. IIED Claim Against Pitt**

Pitt also argues that Plaintiff fails to state a claim for IIED. "To plead an IIED claim under New York law, a complaint must allege '(1) extreme and outrageous conduct; (2) intent to cause, or reckless disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress.'" *Gregory Wayne Designs, LLC v. Lowry*, No. 24-CV-2109 (PAE), 2024 WL 3518584, at *6 (S.D.N.Y. July 24, 2024) (quoting *Conboy v. AT & T Corp.*, 241 F.3d 242, 258 (2d Cir. 2001)). Here, Pitt contests only the first two elements: whether the conduct was "extreme and outrageous" and whether Plaintiff has sufficiently alleged intent. (*See* Pitt MTD, Dkt. 46-1, at 9–11.) But both are sufficiently pled.

1. Extreme and Outrageous Conduct

"An IIED defendant's conduct must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Asinga v. Gatorade Co.*, No. 25-1378, 2026 WL 2078859, at *3 (2d Cir. July 17, 2026) (summary order) (quoting *Chanko v. ABC, Inc.*, 29 N.Y.S.3d 879, 886 (2016)).[24] As Pitt correctly notes, "New York law does not permit IIED claims to proceed merely because conduct is offensive, disturbing, humiliating, or inappropriate." (Pitt MTD, Dkt.

[24] "Whether the alleged conduct is sufficiently extreme and outrageous is a matter of law for the courts to decide." *Tigano v. United States*, 527 F. Supp. 3d 232, 246 (E.D.N.Y. 2021) (quoting *Frigerio v. United States*, No. 10-CV-9086 (SAS), 2011 WL 3163330, at *9 (S.D.N.Y. July 22, 2011)).

46-1, at 9 (citations omitted).)[25] But therein lies the fatal flaw in his argument: his alleged conduct was not merely offensive and disturbing, it was the definition of extreme and outrageous.

Plaintiff alleges that Pitt spent approximately an hour masturbating in his airplane seat while seated just inches away from her and in plain view. Not only is public masturbation on its own beyond all possible bounds of decency, but Pitt allegedly engaged in this act for an extremely prolonged period with the intention that Plaintiff observe him and while she was essentially trapped in her seat. The unfortunate reality is that similar incidents are increasingly common,[26] but they are nonetheless "utterly intolerable in a civilized community." *See Asinga*, 2026 WL 2078859, at *3 (citation omitted).

Pitt cites cases in which courts found that the conduct at issue was not "extreme and outrageous," but each only proves Plaintiff's point, as none are as extreme as what is alleged here. He cites cases where, for example, a colleague harassed and intimidated the plaintiff and slapped

[25] *See Blanco v. Success Acad. Charter Schs., Inc.*, No. 23-CV-1652 (LJL), 2024 WL 3427076, at *4 (S.D.N.Y. July 16, 2024) ("Acts which merely constitute harassment, disrespectful or disparate treatment, a hostile environment, humiliating criticism, intimidation, insults or other indignities fail to sustain a claim of [IIED] because the conduct alleged is not sufficiently outrageous." (internal quotation marks and citations omitted)); *Gorman v. Covidien, LLC*, 146 F. Supp. 3d 509, 535 (S.D.N.Y. 2015) ("Insults, bullying, and general harassment do not usually constitute a claim for IIED under New York law . . . ."); *J.H. v. Bratton*, 248 F. Supp. 3d 401, 415 (E.D.N.Y. 2017) (collecting cases and recognizing that "courts in New York have disallowed IIED claims based on findings that various types of conduct, although highly anti-social and offensive, do not rise to the level of extremity and outrageousness required to plead an IIED claim").

[26] *See, e.g.*, Scott MacFarlane & Laura Geller, *Sexual assaults on airplanes are up, and likely underreported, a CBS News investigation finds*, CBS News (Feb. 15, 2026, at 20:39 ET), https://www.cbsnews.com/news/sexual-assaults-on-airplanes-cbs-news-investigation/ [https://perma.cc/2Y7E-U9JV] ("A CBS News investigation found the FBI investigated more than 170 . . . cases of passengers [sexually] assaulting other passengers on flights in 2024. That's up from about 130 the year before. It's a small fraction of the millions of air travelers each year, but CBS News found that number is up sharply. There's fear the cases are widely underreported, and the airline industry and authorities aren't aggressively tracking in-air assaults. . . . CBS News' examination found many of the incidents happen on long distance or international flights, often at night and often when the attacker has consumed alcohol.").

the plaintiff's backside in an outburst of rage,[27] or where a supervisor displayed in the workplace nude photographs of plaintiff taken as part of plaintiff's second job as a nude model.[28] These circumstances were simply not as extreme and outrageous as Pitt's hour-long menacing conduct toward Plaintiff within inches of her in a confined space.

Of the cases Pitt cites, the most analogous is *Morin v. Fordham University*, No. 21-CV-7909 (NSR), 2022 WL 4586042 (S.D.N.Y. Sep. 28, 2022). (*See* Pitt MTD, Dkt. 46-1, at 9–10 (citing *Morin*, 2022 WL 4586042, at *6–7).) In *Morin*, a college student was attending a class session via Zoom video conference. 2022 WL 4586042 at *1. At one point during the class session, the other students moved to a breakout room while the plaintiff remained in the primary Zoom room with her camera off, and she was otherwise not visibly present. *See id.* While only the plaintiff and the defendant instructor were present in the video conference room, the defendant masturbated for ninety seconds while he was in view of the camera from above the waist. *Id.* The defendant's actions suggested that he had been unaware that anyone else, including the plaintiff, was present to observe his actions. *See id.* at *2 (after masturbating, the defendant walked away from the screen, and then returned and said "[plaintiff], are you still there?" before removing the plaintiff from the video conference). The court held that the allegations "while disturbing, [we]re insufficient" to constitute "extreme and outrageous" conduct. *Id.* at *6. In particular, the court recognized that, unlike sexual misconduct cases that did give rise to IIED claims, this was a "remote occurrence with no threat of bodily contact looming." *Id.* at *7. The conduct here is quite different and much more outrageous. While the *Morin* defendant seemingly had a subjective,

[27] (Pitt MTD, Dkt. 46-1, at 9 (citing *Jaffe v. Nat'l League for Nursing*, 635 N.Y.S.2d 9, 9 (1st Dep't 1995)).)

[28] (Pitt MTD, Dkt. 46-1, at 9 (citing *Anderson v. Abodeen*, 816 N.Y.S.2d 415, 415–16 (1st Dep't 2006)).)

though somewhat unreasonable or reckless, belief he was not in view of others, here, Pitt knowingly masturbated in close physical proximity to Plaintiff and dozens of other passengers, and did so for *one hour* with the alleged intent of directing his conduct at Plaintiff and getting her to notice it, which includes at least a plausible threat of physical contact. Accordingly, the *Morin* defendant's conduct, while "disturbing," is distinguishable from Pitt's, which, as alleged, exceeded "all possible bounds of decency, and [should] be regarded as atrocious[] and utterly intolerable in a civilized community." *Asinga*, 2026 WL 2078859, at *3 (citation omitted).

Thus, the Court finds, as a matter of law, that Pitt's alleged conduct qualifies as "extreme and outrageous" conduct sufficient to state an IIED claim.

2. <u>Intent to Cause Severe Emotional Distress</u>

As to intent, Pitt argues that Plaintiff's allegation that Pitt masturbated with the intention that Plaintiff would see him and that it would cause her physical and emotional injuries, (*see* TAC, Dkt. 52-1, ¶ 123), is conclusory and insufficient to "show[] an intent to cause severe emotional distress." (Pitt MTD, Dkt. 46-1, at 10–11; *accord* Pitt Reply, Dkt. 54, at 7.) This allegation is neither.

Plaintiff alleges non-conclusory, concrete facts that give rise to a plausible inference of intent to cause severe emotional distress: that Pitt masturbated in close proximity to her in clear view for approximately sixty minutes in a space where she was trapped and unable to escape or otherwise avoid being exposed to his behavior. No reasonable person would think that this conduct would not cause the adjacent passenger to suffer severe emotional distress.[29] Thus, this allegation is sufficient, at a minimum, to show Pitt's "reckless disregard of a substantial probability of

[29] Notably, Defendant Pitt mentions "reckless disregard" as an alternative to "intent to cause" only in passing, making his own conclusory arguments that Plaintiff did not plead it. (*See* Pitt MTD, Dkt. 46-1, at 10; Pitt Reply, Dkt. 54, at 7.)

causing[] severe emotional distress." *Gregory Wayne Designs*, 2024 WL 3518584, at *6 (describing intent element of IIED as "intent to cause, *or reckless disregard of a substantial probability of causing*, severe emotional distress" (emphasis added)).

The Court therefore finds that Plaintiff has sufficiently alleged the intent element of her IIED claim.

3. <u>Plaintiff's IIED Claim is Not Impermissibly Duplicative of Her Assault Claim</u>

Pitt also incorrectly argues that Plaintiff's IIED claim should be dismissed as improperly duplicative of her assault claim. (*See* Pitt MTD, Dkt. 46-1, at 11.) Instead, any concerns of duplication between assault and IIED claims are better addressed at the damages calculation stage, through jury instructions and, if needed, post-trial motions. Pitt cites only two cases in support of his argument, (*see id.* (citing *McIntyre v. Manhattan Ford, Lincoln-Mercury, Inc.*, 682 N.Y.S.2d 167, 167 (1st Dep't 1998); *Druschke v. Banana Republic, Inc.*, 359 F. Supp. 2d 308, 315 (S.D.N.Y. 2005))), and the Court finds neither sufficiently persuasive to justify dismissal of Plaintiff's IIED claim at this stage.

In fact, Pitt's citation to *McIntyre* only confirms that any duplication concerns are properly addressed through damages calculations, not at the motion-to-dismiss stage. In *McIntyre*, the appellate division affirmed a trial court's post-verdict holding that the *damages* the jury had awarded for the IIED claim were improperly duplicative of the damages awarded for other torts. *See* 682 N.Y.S.2d at 169. In so holding, *McIntyre* accords with many other courts that have similarly held that any duplication concern is properly addressed at the damages calculation stage. *See, e.g.*, *Giuffre v. Andrew*, 579 F. Supp. 3d 429, 452 (S.D.N.Y. 2022) (rejecting duplication argument at motion-to-dismiss stage and concluding that IIED and battery claims could proceed because they were not duplicative where a jury could "return a damages award on emotional

distress that is over and above what it might award on battery," so the awards would not necessarily be duplicative, and "any risk of duplicative recovery may be resolved by jury instructions"); *Bensky v. Indyke*, 743 F. Supp. 3d 586, 598 (S.D.N.Y. 2024) (rejecting duplication argument at motion-to-dismiss stage because "the intentional-infliction and negligence claims are supported by different facts and have different potential damages, so they aren't duplicative," and "if they are duplicative, [d]efendants w[ould] suffer no prejudice since the negligence claim [wa]s proceeding anyway" (citations omitted)); *Rentas v. Ruffin*, 816 F.3d 214, 227 (2d Cir. 2016) (affirming district court's allowing IIED and other tort claims to go before the jury because the district court "was careful to instruct the jury specifically that any damages it awarded [plaintiff] for the IIED claim must be separate from the emotional damages it awarded him for other claims," and that "[a]ny error that may have occurred from the potential overlap of these claims was therefore harmless"). *McIntyre*, therefore, does not support dismissing Plaintiff's IIED claim at this stage.

Pitt also cites *Druschke* for its holding that the plaintiff's IIED and NIED claims were duplicative of other tort remedies and that the IIED and NIED claims should thus be dismissed. *See* 359 F. Supp. 2d at 315–16; (Pitt MTD, Dkt. 46-1, at 11). But the Court declines to follow *Druschke* given the more recent case law referenced above, most notably the Second Circuit's binding decision in *Rentas*, *see supra*. The question of duplication meriting dismissal is at best unsettled. *Cf. Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 160 (2d Cir. 2014) (recognizing that the question of whether an IIED tort claim is categorically unavailable when the plaintiff pursues other remedies, in that case statutory remedies, remains open under New York law, and that a definitive answer would require certifying the question to the New York Court of Appeals). Here, the Court finds that allowing the IIED claim to proceed is prudent and appropriate, given that any

duplication concerns can be adequately addressed by jury instructions or in post-verdict proceedings.

**D. NIED Claim Against Pitt**

Finally, Pitt argues that Plaintiff fails to state a claim for NIED. To plead an NIED claim under New York law, "a plaintiff must allege (1) a breach of a duty owed to the plaintiff; (2) emotional harm; (3) a direct causal connection between the breach and the emotional harm; and (4) circumstances providing some guarantee of genuineness of the harm." *Francis v. Kings Park Manor, Inc.*, 992 F.3d 67, 81 (2d Cir. 2021) (citing *Ornstein v. N.Y.C. Health & Hosps. Corp.*, 852 N.Y.S.2d 1, 3–4 (2008); *Taggart v. Costabile*, 14 N.Y.S.3d 388, 395–96 (2d Dep't 2015)).

1. Duty Owed to Plaintiff

Pitt argues that Plaintiff has not sufficiently alleged that he owed any duty to Plaintiff. The Court disagrees.

Under New York law, a plaintiff can establish the duty element of an NIED claim through (1) the "bystander" theory, (2) the "direct duty" theory, or (3) the "special circumstances" theory. *See Baker v. Dorfman*, 239 F.3d 415, 421 (2d Cir. 2000) (citations omitted); *Truman v. Brown*, 434 F. Supp. 3d 100, 122–23 (S.D.N.Y. 2020) (recognizing that the "special circumstances" theory is formally a third alternative); *Ranta v. City of New York*, 481 F. Supp. 3d 115, 118–19 (E.D.N.Y. 2020) (similar). Under the "special circumstances" theory, a plaintiff can maintain an NIED claim in the absence of a specific duty "where there is 'an especial likelihood of genuine and serious mental distress, arising from . . . special circumstances, which serves as a guarantee that the claim is not spurious.'" *Baker*, 239 F.3d at 421 (ellipses in original) (quoting *Johnson v. State*, 372 N.Y.S.2d 638, 642 (1975)).

In *Johnson*, where the "special circumstances" theory originated, the New York Court of Appeals reasoned that an NIED claim was viable in the absence of a "direct duty" because the

consequences of the tortfeasor's actions "were all within the 'orbit of the danger' and therefore within the 'orbit of the duty' for the breach of which a wrongdoer may be held liable." 372 N.Y.S.2d at 642 (quoting *Palsgraf v. Long Island R.R. Co.*, 248 N.Y. 339, 343 (1928)). In propagating the "special circumstances" theory on this basis, the Court of Appeals effectively acknowledged that, unlike the "direct duty" theory that requires an established and recognized relationship to confer a duty, the "special circumstances" theory places a more temporary and circumstance-specific duty on people. For example, while hospitals do not have an established and lasting relationship with patients' loved ones sufficient to create a "direct duty," in the specific context of possessing information about whether the patients are alive or not, or in keeping track of deceased patients' remains, those loved ones temporarily come within the "orbit" in which the hospital's dangerous and negligent acts can harm them. *See Johnson*, 372 N.Y.S.2d at 642; *see also Lando v. State of New York*, 385 N.Y.S.2d 759, 759–60 (1976) (finding that hospital owed duty to the father of a mentally deficient patient who disappeared and whose remains were found eleven days later in close proximity to the hospital, and that hospital breached the duty in not having undertaken a diligent search); *Jones v. City of New York*, 915 N.Y.S.2d 73, 74 (1st Dep't 2011) (city medical examiner mistakenly sent remains of plaintiff's son to a funeral home in another state where he was then buried, necessitating the remains later being exhumed and returned). Courts have also recognized such "special circumstances" in a variety of other contexts, such as where a laboratory negligently gave a misdiagnosis of HIV, *see Baker*, 239 F.3d at 422; a man was wrongfully convicted of a crime after being framed, and his ex-wife and children sued for the distress caused, *Ranta*, 481 F. Supp. 3d at 118; and federal immigration agents separated parents from their children, barred them from communicating, and did so in a way calculated to cause maximum distress, *D.J.C.V. v. United States*, 605 F. Supp. 3d 571, 600–01 (S.D.N.Y. 2022).

Here too, Plaintiff, though arguably owed no direct duty by Pitt, was in the "orbit of the danger" resulting from him due to the specific circumstances of their encounter. Had another passenger who was seated further away noticed Pitt's acts of masturbation, they likely would not have a claim. So too if Plaintiff had noticed Pitt's conduct while she was out of her seat. But while Plaintiff was seated next to him, such that he was effectively trapping her in her seat, during his acts of masturbation, she was in the "orbit of the danger" from him specifically. These special circumstances "serve[] as a guarantee that [Plaintiff's NIED] claim is not spurious." *See Baker*, 239 F.3d at 421 (citation omitted). Given the nature of Pitt's conduct, it is obvious that emotional distress would result—an average person sitting in Plaintiff's seat would have such a reaction. *See Brown v. N.Y. Design Ctr., Inc.*, 185 N.Y.S.3d 97, 100–01 (1st Dep't 2023) (finding that the standard was satisfied where plaintiffs' fears were "certainly reasonable" and their "psychological traumas [were] readily and unquestionably understandable"); *Ranta*, 481 F. Supp. 3d at 120 ("The limiting factor for the 'special circumstances' variant is not whether the defendant's conduct threatens the plaintiff's physical safety, but whether it foreseeably has a genuine, albeit solely emotional, impact.").

At the same time, recognizing Pitt's duty not to harm Plaintiff under these special circumstances does not run the risk of unduly broadening the scope of liability to include anyone else who saw Pitt's conduct that night. *See Johnson*, 37 N.Y.2d at 383 (explaining that special circumstances existed because the harm was inflicted directly upon the plaintiff, but that the rule does not permit claims where there is "unintended harm sustained by [a plaintiff], solely as a result of injuries inflicted directly upon another" (distinguishing *Tobin v. Grossman*, 301 N.Y.S.2d 554 (1969))). It was Pitt's proximity to, and de facto trapping of, Plaintiff that uniquely exposed her

to the emotional harms of Pitt's conduct and consequently imposed on him a duty that now gives rise to Plaintiff's NIED claim.

2. Breach

Pitt also appears to argue that even if he owed Plaintiff a duty, she has not sufficiently alleged a breach of that duty, because she "does not plead actual physical danger or reasonable fear for her physical safety." (Pitt MTD, Dkt. 46-1, at 13–14.) Pitt argues that Plaintiff's fear that he "may [have] attempt[ed] to touch her if she tried to get up or closed her eyes or pretended to be asleep," (TAC, Dkt. 52-1, ¶ 35), is insufficient because "[i]t does not allege actual physical danger," "[n]or does it allege reasonable fear that physical safety was imminently threatened," (Pitt MTD, Dkt. 46-1, at 13). However, the Court has already rejected this meritless argument in the context of Plaintiff's assault claim. As previously discussed, Plaintiff *has* alleged physical danger and a reasonable fear that physical safety was imminently threatened.

**CONCLUSION**

For the reasons explained above, (1) Defendant American Airlines' motion to dismiss is GRANTED in part and DENIED in part, insofar as Plaintiff's breach of contract claim is dismissed, but Plaintiff's Montreal Convention claims against Defendant American Airlines shall proceed; (2) Defendant American Airlines' motion to strike is DENIED; (3) Plaintiff's cross-motion for leave to amend and file her TAC is GRANTED; and (4) Defendant Pitt's motion to dismiss is DENIED in its entirety, and Plaintiff's claims against Defendant Pitt shall proceed. Plaintiff shall file her TAC no later than October 14, 2026. Plaintiff and Defendant American Airlines shall meet and confer regarding whether they can reach an agreement about how to handle Plaintiff's Montreal Convention Article 21 claim.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: September 29, 2026
Brooklyn, New York